PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NORTHEAST CABLE TELEVISION, LLC, | ) | |
| | ) | CASE NO. 4:18CV2559 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| DIRECTV, LLC, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** [Resolving ECF Nos. 1-3, 22] |

Plaintiff/Counter-Defendant Northeast Cable Television, LLC ("Northeast Cable"), and

Defendant/Counter-Claimant DIRECTV, LLC ("DIRECTV"), each moves the Court to enter a

preliminary injunction against the other.[1] ECF Nos. 1-3, 21, 22; 39-1. Northeast Cable asks the

Court to enjoin DIRECTV from interfering with or disconnecting satellite television service to

Northeast Cable's customers, ECF No. 21 at PageID#: 138, and DIRECTV asks the Court to

enjoin Northeast Cable from reselling, retransmitting, and rebroadcasting DIRECTV

programming to its customers and from holding itself out as a television programming provider,

ECF No. 22 at PageID#: 154-55. Northeast Cable insists that DIRECTV has interfered in its

lawful business contracts, and DIRECTV counters that Northeast Cable's business is premised

on a scheme to defraud DIRECTV and deceive Northeast Cable's own customers.

Both parties have fully briefed their positions, and the Court held a hearing on March 29,

2019. *See* ECF Nos. 22, 23, 24, 26, 27, 38, 43, 46, 50. Based on the argument and evidence

---

[1] DIRECTV also seeks an injunction against Northeast Cable principals, Counter-
Defendants Albert and Deborah Pezzenti. ECF No. 22.

(4:18CV2559)

presented, Northeast Cable's motion for preliminary injunction (ECF No. 1-3) is denied, and

DIRECTV's motion for preliminary injunction (ECF No. 22) is granted.

## I. Background

DIRECTV operates a satellite television service that provides hundreds of channels to

consumers.  ECF No. 21 at PageID#: 140; ECF No. 22-1 at PageID#: 159.  To view DIRECTV's

programming, a subscriber must possess and have installed certain equipment that can decrypt

the DIRECTV signal and produce the programming on the television screen.  ECF No. 21 at

PageID#: 140; ECF No. 22-1 at PageID#: 159.

Individual resident subscribers typically purchase their programming directly with

DIRECTV, but for certain kinds of multiple-unit properties, DIRECTV sometimes provides

service through a "Satellite Master Antenna Television System" ("SMATV").  ECF No. 21 at

PageID#: 140; ECF No. 22-1 at PageID#: 159-60.  An SMATV Viewing Agreement positions

DIRECTV as the provider and the SMATV property owner or manager as the "customer."

ECF No. 38 at PageID#: 1681.  More precisely, in the SMATV Viewing Agreement,

"'Customer' means the owner or manager of the business entity identified below that is a hotel,

motel, hospital, college dormitory, private office, and/or other facility (as permitted by

DIRECTV in its sole discretion) that is responsible for the payment of fees and charges to

DIRECTV."  ECF No. 22-4 at PageID#: 189.  DIRECTV charges the SMATV property[2] monthly

fees based on the type of property as well as the programming ordered and the number of

individual units with access to the programming.  *Id.*

---

[2] According to the SMATV Viewing Agreement, "'Property' shall mean that location, identified by Customer, in which Customer's satellite television system and Customer's Subscriber Unit(s) are located."  ECF No. 22-4 at PageID#: 189.

An SMATV arrangement is designed to provide DIRECTV programming to individual viewers as a courtesy of occupancy in the SMATV property (usually a hotel or motel, hospital, college dormitory, or individual office). The SMATV customer (the owner of manager of the SMATV property) is prohibited from charging the individual viewers for DIRECTV programming. ECF No. 22-4 at PageID#: 191. The SMATV Viewing Agreement requires that all subscriber units receive DIRECTV programming, and the SMATV customer is prohibited from rebroadcasting, retransmitting, or reselling DIRECTV programming.[3] *Id.*

To facilitate such an arrangement, DIRECTV sometimes engages authorized dealers who provide, install, and maintain necessary equipment for end consumers who stay at SMATV properties. ECF No. 21 at PageID#: 140; ECF No. 22-1 at PageID#: 160. Authorized dealers, in turn, are permitted to engage their own subcontractors. ECF No. 38 at PageID#: 1680. Such dealers and their subcontractors collect residual commissions on the properties for which they install and maintain equipment, but they may not themselves bill the properties for DIRECTV programming unless they complete a rigorous application process to become "Authorized Billers." *Id.* According to DIRECTV witness Terek Milligan, the Authorized Biller application is rigorous, and such status is rare because DIRECTV has legal obligations with content providers, and delegating billing responsibilities to a third party exposes DIRECTV to legal risk of under- or over-billing. ECF No. 50 at PageID#: 2060-61. In the absence of any Authorized

---

[3] The SMATV Viewing Agreement acknowledges that, in a technical sense, the SMATV customer necessarily "rebroadcasts" DIRECTV's signal to the subscriber units in the property by virtue of channeling the signal from the property's main receiver to individual units' television screens. Whatever "rebroadcasting" is technically necessary to direct programming to individual SMATV units is, of course, not prohibited. That commonsense exception is spelled out in the Viewing Agreement itself. ECF No. 22-4 at PageID#: 191, ¶ 13(d).

Biller arrangement, DIRECTV bills the property owner or manager directly. ECF No. 38 at PageID#: 1680-82; ECF No. 22-4 at PageID#: 189.

Northeast Cable principal Al Pezzenti represents that, in 2003, he was approached by a representative of authorized DIRECTV dealer, North American Cable Equipment. ECF No. 21 at PageID#: 150-51. That representative, Pezzenti says, proposed an arrangement according to which Northeast Cable would transmit DIRECTV programming to 14 multi-unit properties in Ohio and pay the bills to DIRECTV on the properties' behalf. *Id.* at PageID#: 151. Northeast Cable, approving of the idea, entered "service agreements" (or "maintenance agreements") with 14 properties in which it charged a monthly fee in exchange for providing necessary equipment, performing maintenance, and paying DIRECTV's programming bill each month. *Id.*; *see, e.g.*, ECF No. 22-3. Each of the properties, in turn, arranged SMATV Viewing Agreements with DIRECTV, on which Al Pezzenti or Northeast Cable usually listed itself as the "authorized customer," "general manager," or something similar. *See* ECF No. 38 at PageID#: 1681; *see also, e.g.*, ECF No. 22-4.

Put simply, Northeast Cable acts a middleman (along with North American Cable Equipment and another authorized dealer, Passive Devices, Inc.) between DIRECTV and the SMATV properties. Northeast Cable purchases equipment from North American Cable Equipment and Passive Devices, Inc., installs and maintains that equipment at the SMATV properties, collects payments from the SMATV properties,[4] and remits a portion of those

---

[4] In most cases, the SMATV property owner or manager collects the payments from individual viewers and sends a single payment to Northeast Cable. In at least one instance, however, Northeast Cable collects payments directly from individual viewers. ECF No. 38 at PageID#: 1683; ECF No. 22-62 at PageID#: 1158-59; *see* ECF No. 22-64.

(continued...)

payments to North American Cable Equipment and Passive Devices, Inc. to cover the SMATV properties' monthly DIRECTV programming bills. Ashtabula Metropolitan Housing Authority Executive Director James Noyes testified at the preliminary injunction hearing that Northeast Cable routinely bills about $4,300 to $4,500 per month for Ashtabula properties, whereas DIRECTV would have billed the properties at about $1,400 to $1,600 per month if it had billed directly. ECF No. 50 at PageID#: 2090. Al Pezzenti confirmed at the hearing that his bills to SMATV properties are ordinarily significantly higher than DIRECTV's programming bills. *See id.* at PageID#: 2025-27.

Al Pezzenti attests that, "[f]or nearly 15 years, Northeast Cable has complied with all of [DIRECTV's] requirements and has timely remitted payment to [DIRECTV]." ECF No. 21 at PageID#: 152. He further attests that North American Cable Equipment and Passive Devices, Inc., themselves authorized DIRECTV dealers (but not Authorized Billers), were aware of Northeast Cable's arrangements with the SMATV properties, *id.*, and Northeast Cable argues that DIRECTV should therefore be imputed with "direct knowledge" of Northeast Cable's practices, *id.* at PageID#: 142-43.

In Northeast Cable's briefing and Al Pezzenti's affidavit and deposition, both appeared to resist being designated the "customer" on the SMATV Viewing Agreements. "The Viewing Agreement for each of the properties states the name of the property and property owner. However, Northeast Cable/Al Pezzenti is listed as the installer, contact for installation at the property, and the party to whom the [DIRECTV] bill is to be directed." ECF No. 21 at PageID#:

---

[4](...continued)

151; ECF No. 27-3 at PageID#: 1588 (Asked whether he is the "customer," Al Pezzenti replied, "We're the maintenance and administrating people that make the system work.").  In most Viewing Agreements, if Northeast Cable is listed at all, it is listed as "Northeast Management" or "Northeast Sales," both of which are fictitious, "doing-business-as" names.  *See* ECF No. 50 at PageID#: 1924-25, 1994-95.

Also in his deposition, Al Pezzenti acknowledged that, on some of the Viewing Agreements, his name is listed as the *customer* (rather than the "installer" or "contact for installation").  ECF No. 27-3 at PageID#: 1588.  In fact, Pezzenti is listed variously as the "Authorized Customer," "General Manager," "Authorized Officer/Agent," "Authorized Property Owner or Manager," "Contact at Property," "Contact at Mailing Address," and "Contact at Establishment."  ECF No. 38 at PageID#: 1681; *see also* exhibits cited at ECF No. 22-1 at PageID#: 162, n.15.  At the preliminary-injunction hearing, Northeast Cable firmly took the position that it (or its principal Al Pezzenti) is properly designated the "customer" on the SMATV agreements, its counsel insisting, "The customer . . . has always been Al Pezzenti." ECF No. 50 at PageID#: 1890.

Deborah Pezzenti, Al's wife, is also listed as the credit card holder on certain Northeast Cable accounts, and her credit card information is listed as the payment method on some SMATV agreements.  ECF No. 38 at PageID#: 1682.

Al Pezzenti admits that Northeast Cable is not an Authorized Biller.  ECF No. 27-3 at PageID#: 1588.  He maintains that Northeast Cable "does not resell, retransmit, or otherwise bill its commercial or institutional customers for [DIRECTV] programming," and that it does not charge individual viewers for DIRECTV programming (both of which SMATV customers are

expressly prohibited from doing in the Viewing Agreements).  ECF No. 21 at PageID#: 152.  On

the witness stand, however, he agreed that he transmitted DIRECTV programming to SMATV

properties, collected monthly payments from SMATV properties on behalf of individual viewers,

and used those payments to cover the SMATV properties' monthly DIRECTV programming

bills.  *See* ECF No. 50 at PageID#: 1933, 1998-2001, 2037.  Additionally, in his deposition

testimony, Al Pezzenti acknowledges that Northeast Cable bills tenants directly for at least one

SMATV property.  ECF No. 27-3 at PageID#: 1559.

DIRECTV further alleges that Northeast Cable has vastly underreported the number of

units receiving programming service at the SMATV properties.  *See* ECF No. 22-1 at PageID#:

163 and accompanying citations.  Al Pezzenti states that, "[s]ince the inception of the Viewer

Agreements, [DIRECTV] has never audited or otherwise reevaluated the number of subscribers

originally stated on the Viewer Agreements."  ECF No. 21 at PageID#: 151.  DIRECTV

counters: (1) that it perceived no reason to audit the 14 SMATV properties because nothing

seemed amiss until it received a tip from a third party suspecting unauthorized activity, *see* ECF

No. 50 at PageID#: 2067-68, and (2) that there is ordinarily no need to distinguish between total

units and total *subscribing* units because, according to the SMATV arrangement, all SMATV

property occupants receive programming whether they ask for it or not.  "[I]f there's 200 rooms

in the hotel, we will charge for 200 rooms."  *Id.* at PageID#: 2063.

DIRECTV also alleges that Northeast Cable, in at least two cases, broadcasts DIRECTV

programming from one SMATV property to another non-SMATV property.  In his hearing

testimony, Al Pezzenti admitted that Northeast Cable broadcasts signal with rooftop microwave

equipment from the Elms apartments to two Riverview properties three miles away, and that he

bored a channel into the ground to distribute the Lakeview signal to the Gulfview apartments across the street. *Id.* at PageID#: 1987-90, 2005-06, 2013-16. He acknowledged that the Elms apartments is at a distinct location from each lot of Riverview apartments and that the Lakeview apartments are at a distinct location from the Gulfview apartments, and that neither the Riverview properties nor the Gulfview property has an SMATV arrangement with DIRECTV.[5] *Id.*

DIRECTV also alleges that Northeast Cable holds itself out as the SMATV properties' "cable television programming provider,"omitting any reference to DIRECTV even though the SMATV property residents in fact receive DIRECTV programming. ECF No. 39-1 at PageID#: 1720. Northeast Cable, says DIRECTV, represents to its customers that it is a competitor of DIRECTV rather than a conduit (albeit unauthorized). *Id.* at PageID#: 1720-22. At the hearing, DIRECTV presented evidence of Northeast Cable's flyers, posters, and certain of Al Pezzenti's communications with property owners and managers. One advertisement says, "Are you overpaying? Why pay double to watch the same channels? Call Northeast Cable today! Ditch the dish and get the same channels for half price." ECF No. 27-4. Northeast Cable also distributed a "TV Channel Selection Guide," listing the channels available through Northeast

---

[5] DIRECTV alleges a third instance of concealed rebroadcasting from Brookside Trailer Park (which does not exist) to Stoneybrooke Village (which does). Brookside is party to a SMATV arrangement with DIRECTV, and Stoneybrooke is not. Al Pezzenti admitted that there was a mistake on the paperwork for Stoneybrooke Village, ECF No. 50 at PageID#: 2011-13, but in contrast to the Elms/Riverview and Lakeview/Gulfview transmissions, the Brookside/Stoneybrooke mixup appears to reflect mistake, not deceit. Northeast Cable serves two trailer parks, Stoneybrooke Village and Bayshore Mobile Home Park. Each has an SMATV Viewing Agreement and both were disclosed to DIRECTV in litigation. ECF Nos. 22-32, 22-28; *see* ECF No. 11. Stoneybrooke Village, however, is listed under the wrong name ("Brookside Trailer Park") and at the wrong address. *See* ECF No. 50 at PageID#: 2011-13; ECF No. 27-3 at PageID#: 1566-67.

Cable without any indication that DIRECTV was the true source of the programming. ECF No. 43-1. In letters written directly to residents, Northeast Cable described itself as "your cable television service provider," and attached a "TV Channel Selection Guide" which made no mention of DIRECTV. ECF Nos. 22-65, 43-1; DIRECTV Hearing Exs. 86, 87. DIRECTV also presented an email written by Al Pezzenti in which he said, "The GOOD news, is that we have a grand selection of channels now so we can EASILY fill up the dial with things that Time-Warner can't even dream about . . . ." DIRECTV Hearing Ex. 133. From the witness stand, Al Pezzenti acknowledged that Time Warner is a competitor of DIRECTV. ECF No. 50 at PageID#: 2041.

At some point in October 2018, DIRECTV "temporarily discontinued service and . . . threatened to permanently discontinue service to [Northeast Cable's customers] in order to induce or purposely cause Northeast Cable customers to bypass Northeast Cable and buy DIRECTV's service . . . directly from DIRECTV." ECF No. 1-1 at PageID#: 10. Following a status conference on November 16, 2018, the parties agreed to preserve the status quo (in which DIRECTV continued to provide service to the SMATV properties and Northeast Cable continued to pay DIRECTV's programming bills on the properties' behalf) pending the resolution of the parties' respective motions for preliminary injunction. ECF No. 11.

Northeast Cable argues that DIRECTV's threatened discontinuation amounts to tortious interference with Northeast Cable's legitimate business contracts, and it moves the Court to preliminarily enjoin DIRECTV from discontinuing satellite TV programming to Northeast Cable's customers. ECF No. 21 at PageID#: 138; *see* ECF No. 1-1. DIRECTV filed counterclaims alleging various statutory and common-law claims, including unauthorized publication of communications, false designation of origin and false advertising, and fraud. And

it moves the Court to preliminarily enjoin Northeast Cable from transmitting DIRECTV's signal to its own customers, from using equipment to receive DIRECTV's signal to aid unauthorized access to its programming, and from contracting with property owners and end consumers to provide DIRECTV programming. ECF No. 22 at PageID#: 154-55; ECF No. 39-1 at PageID#: 1720-22; *see* ECF No. 13.

## II.  Standard of Review

Fed. R. Civ. P. 65 requires the Court to balance four factors when determining  whether a preliminary injunction should issue.  A movant must show that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  These four considerations are "factors to be balanced, not prerequisites that must be met."  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003), *abrogated on other grounds by Anderson v. City of Blue Ash*, 798 F.3d 338 (6th Cir. 2015)).  "The district judge 'is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue.'"  *Id*.  "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal."  *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

### III. Law and Analysis

**A. Northeast Cable's Motion for Preliminary Injunction (ECF Nos. 1-3, 21)**

Northeast Cable asks the Court to enjoin DIRECTV from discontinuing service to Northeast Cable's customers. ECF Nos. 1-3, 21. To satisfy the first of the four preliminary-injunction factors, Northeast Cable insists that it is likely to succeed on the merits of its state-law tortious-interference claim against DIRECTV. ECF No. 21 at PageID#: 144-46.

Under Ohio law, a successful claim for tortious interference with a contract must show (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages. *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 864 (Ohio 1995); Restatement (Second) of Torts § 766 (1979). Northeast Cable addresses each element in turn and asks the Court to conclude that DIRECTV's threatened discontinuation of service checks all the boxes. ECF No. 21 at PageID#: 144-46. It contends that (1) Northeast Cable is party to installment-and-maintenance agreements with the 14 SMATV properties, (2) DIRECTV is directly aware of those installment-and-maintenance agreements because its dealers must have made it so aware, (3) DIRECTV has already suspended programming once and threatens to do so again (4) "without justification or privilege," and (5) discontinuation will empty Northeast Cable's equipment investments of any value and Northeast Cable will be forced out of business.

Northeast Cable advances little reasoning in support of the second element and none in support of the fourth. If Northeast Cable's involvement in the SMATV properties' satellite TV arrangement was itself fraudulent (as DIRECTV urges), then DIRECTV would not be unjustified in trying to oust Northeast Cable from DIRECTV's relationships with the SMATV properties.

(4:18CV2559)

Al Pezzenti acknowledges that Northeast Cable is not an Authorized Biller, ECF No. 27-3 at PageID#: 1588, and he acknowledges that Northeast Cable is not permitted to "resell, retransmit, or otherwise bill its commercial or institutional customers for [DIRECTV] programming," ECF No. 21 at PageID#: 152, nor to "charge its Subscriber Units (nor the guests, residents, or other occupants of the Subscriber Units)" for DIRECTV programming, *see* ECF No. 22-4 at PageID#: 191.

Al Pezzenti's conclusory resistance notwithstanding, the Court has no difficulty finding that Northeast Cable charges SMATV properties for DIRECTV programming. At the preliminary injunction hearing, Al Pezzenti asserted repeatedly, "We don't charge [residents] for DIRECTV. We charge them for the maintenance of the line." ECF No. 50 at PageID#: 2003. That distinction, however, is belied by the facts. Northeast Cable sends a bill to each SMATV property, receives payment from the SMATV property collected from individual viewers, and in turn pays the SMATV property's monthly DIRECTV programming bill.

The Court attempted to clarify Al Pezzenti's testimony: "The impression I think you're leaving [DIRECTV's counsel] with is that you don't bill for DIRECTV, when what you're really saying is you bundle all the services you provide and bill for everything in one bill to that unit." Al Pezzenti confirmed, "Yes." ECF No. 50 at PageID#: 2001. Regardless of how Northeast Cable explains or itemizes its charges to the SMATV properties and their individual viewers, the fact is that the cost of DIRECTV programming is a critical element of Northeast Cable's monthly bill to the properties. *See also* ECF No. 38 at PageID#: 1682 (Milligan Declaration: indicating that Northeast Cable directly bills end consumers in some instances); ECF No. 27-3 at PageID#: 1559-60 (Pezzenti deposition: same, as to at least one instance); *see* ECF No. 22-64. In at least

some cases, SMATV property managers were unaware that the television service provided to their residents came from DIRECTV in the first place. ECF Nos. 48-1, 48-2, 48-3, 48-4.

As some property managers mistakenly understood the arrangement until recently, Northeast Cable would "provide cable at a bulk rate that we can then resell to residents." DIRECTV Hearing Ex. 100; ECF No. 22-39 at PageID#: 751 (describing Northeast Cable as "the local cable operator"); *see* DIRECTV Hearing Ex. 204 ("Al . . . We have selected the bulk option.").

The SMATV residents also apparently understand Northeast Cable to be their "cable television service provider." *See* ECF No. 22-65. In one advertisement, Northeast Cable encouraged residents to "[d]itch the dish and get the same channels for half price" from Northeast Cable. ECF No. 27-4. That same advertisement listed a monthly price of $45.95, belying Al Pezzenti's assertion that he does not know "how [the properties] fund any of the checks that they send us."

Near the end of his testimony, Al Pezzenti conceded, "The programming was included with the services" that Northeast Cable provided. ECF No. 50 at PageID#: 2037; *see also* ECF No. 27-3 at PageID#: 1563 (Pezzenti deposition: Q: "And part of what they get for that payment is DIRECTV service, correct?" A: "Part of it, yes.").

Northeast Cable suggests that, even if the details are out of place, DIRECTV is nevertheless unjustified in discontinuing service to SMATV property residents because "Northeast Cable has, at all times, paid [DIRECTV's] bills in full and on time." ECF No. 21 at PageID#: 146, 152. Put differently, "no harm, no foul." But DIRECTV asserts that Northeast Cable has consistently underreported the number of units receiving programming service and

pays DIRECTV based on deflated figures.  At one location, Northeast Cable represented to DIRECTV that 25 units received satellite TV programming, but DIRECTV's own investigation uncovered 127 active units.  ECF No. 38 at PageID#: 1682-83; *see* ECF No. 27-3 at PageID#: 1560 ("more than 50"). In another instance, Northeast Cable reported 25 active units, but DIRECTV uncovered 74.  In another, Northeast Cable reported 20, but DIRECTV uncovered 36. In another, Northeast Cable reported 20, but DIRECTV uncovered 162.  In another, Northeast Cable reported 22 units, but DIRECTV uncovered 98.  ECF No. 38 at PageID#: 1682-83.  The minimum number of units that can be served on an SMATV arrangement is 20.  ECF No. 50 at PageID#: 2023.  DIRECTV's witness states that the investigation into underreporting is still ongoing.  *Id.*

At the hearing, Northeast Cable's counsel denied the allegation of underreporting and countered that Northeast Cable in fact *overpays* for DIRECTV's programming based on the number of actual subscriber units.  ECF No. 50 at PageID#: 1886.  Al Pezzenti echoed that contention in his testimony despite his repeated concessions that he has "no idea" how many residents receive DIRECTV programming in virtually any of the SMATV properties.  *Id.* at PageID#: 1938-44.  He stated that he has no way of knowing the accurate number of subscribing units in any given property because, although he connects DIRECTV's signal to the property, he does not hook up the individual units or, in most cases, directly bill the residents.  *Id.* at PageID#: 1943; *but see* ECF No. 38 at PageID#: 1683; ECF No. 27-3 at PageID#: 1559-60.

Even to the extent that Northeast Cable meaningfully contradicts DIRECTV's allegation of underreporting, the parties' empirical disagreement obscures a more fundamental flaw in the arrangement.  In a typical SMATV arrangement, there should be no need for the customer to

audit and maintain the distinction between the number of total units and the number of units receiving DIRECTV programming because all units would receive programming *gratis*, as a courtesy of their occupancy.  ECF No. 50 at PageID#: 2063.  The SMATV Viewing Agreements contemplate servicing all units located in "a hotel, motel, hospital, college dormitory, private office, and/or other facility (as permitted by DIRECTV in its sole discretion) . . . ."  ECF No. 22-4 at PageID#: 189.  The common thread in that list is that occupants of such units would not ordinarily be expected to arrange and pay for the television programming themselves; rather, programming would be a courtesy provided by the property owner or manager.  And that courtesy would ordinarily be provided to all units, not the few who select it.  *Id.* at PageID#: 189, ¶ 13(b)-(c).  It is not surprising that Northeast Cable is unable accurately to count the number of residents who choose to receive DIRECTV programming; the SMATV arrangement is not designed to permit residents such a choice.

DIRECTV witness Terek Milligan testified that it is possible for an SMATV property to arrange for fewer than 100 percent of total units to receive DIRECTV programming, and that may occur in some instances.  ECF No. 50 at PageID#: 2063-64.  But even in such a scenario, the property owner or manager would always be apprised of the number of units receiving DIRECTV programming (that is, the total number of "subscriber units") and would therefore never be at risk of unwittingly underreporting its subscriptions to DIRECTV.  Northeast Cable posits that it simply cannot know how many individual viewers receive DIRECTV programming at the SMATV properties because it is not the property owner or manager.  Incidentally, that is precisely the reason Northeast Cable is not properly designated the "customer" in the SMATV

arrangements.  *See* ECF No. 22-4 at PageID#: 189 ("'Customer' means the owner or manager of the business entity . . . that is responsible for the payment of fees and charges to DIRECTV.").

Even if Northeast Cable adequately reported the number of subscribers in each identified SMATV property, it would likely still underpay DIRECTV for the programming that it actually transmits.  In testimony, Al Pezzenti admitted that Northeast Cable broadcasts DIRECTV signal from the Elms apartments to two Riverview property locations three miles away, and from the Lakeview apartments to the Gulfview apartments across the street.  ECF No. 50 at PageID#: 1987-90, 2005-06, 2013-16.  Neither of the Riverview locations nor the Gulfview location has an SMATV arrangement with DIRECTV.  As far as Northeast Cable has made DIRECTV aware, there are zero units among those three properties receiving DIRECTV programming.

Finally, Northeast Cable posits that DIRECTV itself is to blame for any harm it has suffered because, over the course of 15 years, DIRECTV did not perform a single audit on any of the SMATV properties.  The argument is unavailing in law and fact.  Northeast Cable points to no law suggesting, in a case like this, that the indiligence of a victim vests rights in the wrongdoer.  Moreover, DIRECTV credibly explains that Northeast Cable's allegedly fraudulent behavior went undetected as a result of Northeast Cable's deceptive conduct.  Northeast Cable listed itself on DIRECTV Viewing Agreements as "Northeast Management," not "Northeast Cable."  According to DIRECTV witness Terek Milligan, "the word 'Cable' may have been a bigger tipoff."  ECF No. 50 at PageID#: 2068.  "Based on the contracts that I reviewed," he said, "nothing on there would have seemed suspicious."  *Id.*

Northeast Cable cannot prove that it is likely to succeed on the merits of its claim because it presents no evidence that DIRECTV would be unjustified in discontinuing service to the

SMATV properties. "Although no one factor is controlling" in assessing whether a preliminary injunction is appropriate, "a finding that there is simply no likelihood of success on the merits is usually fatal" to the request. *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).

Northeast Cable's motion for preliminary injunction (ECF Nos. 1-3, 21) is denied.

**B. DIRECTV's Motion for Preliminary Injunction (ECF Nos. 22, 43)**

DIRECTV asks the Court to issue a preliminary injunction preventing Northeast Cable from reselling, retransmitting, or rebroadcasting its programming, from using equipment to receive and decrypt its satellite transmissions, from contracting with property owners and end consumers to provide DIRECTV's programming, and from falsely designating the origin of and falsely advertising its television programming services. ECF No. 22, *see* ECF No. 39-1. DIRECTV argues that Northeast Cable and related parties' business practices are tortious at common law and that they violate the Federal Communications Act, the Electronic Communications Privacy Act, and the Lanham Act. *Id.*; *see also* ECF No. 13.

**1. Likelihood of Success on the Merits**

DIRECTV's claims sound in statutory and common-law fraud as well as false designation of origin and false advertising. The Court is persuaded that DIRECTV has a high likelihood of success on the merits of many of its claims, as indicated below.

**a. Unauthorized Publication of Communications**

Pursuant to 47 U.S.C. § 605(a), "[N]o person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning

thereof, except through authorized channels of transmission or reception . . . to any person other than the addressee, his agent, or attorney . . . ." "An authorized intermediary of a communication . . . violates the first sentence of § 605(a) when it divulges that communication through an electronic channel to one 'other than the addressee' intended by the sender . . . ." *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 916 (6th Cir. 2001).

*National Satellite Sports* makes clear that an entity violates § 605(a) if it transmits a television signal to viewers other than those intended by the sender, even if that entity is authorized to transmit the signal to some other viewers. *Id.* In this case, until recently, DIRECTV believed itself to be distributing signal to entire properties, in most cases to 20 or 25 units total. Northeast Cable receives that signal and transmits it to many more than 20 or 25 units per property. ECF No. 38 at PageID#: 1682-83; *see* ECF No. 27-3 at PageID#: 1560 ("more than 50"). Northeast Cable also receives signal from the Elms property and transmits it without authorization to the two Riverview properties, and it receives signal at the Lakeview Property and transmits it without authorization to the Gulfview property, with the knowledge that the Riverview properties and the Gulfview property have no SMATV arrangements with DIRECTV. ECF No. 50 at PageID#: 1987-90, 2005-06, 2013-16.

DIRECTV is likely to succeed on the merits of its claim under 47 U.S.C. § 605(a).

### b. Unauthorized Reception of Cable Service

Pursuant to 47 U.S.C. § 553(a), "No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized

by law." Unauthorized reception under § 553 is a strict liability offense. *See* 47 U.S.C. §
553(c)(3)(B),(C).

Northeast Cable receives signal from DIRECTV and transmits it to hundreds of units that
are not reported on the SMATV Viewing Agreements and several properties that had no SMATV
arrangements at all. Northeast Cable then profits from that transmission.

DIRECTV is likely to succeed on the merits of its claim under 47 U.S.C. § 553(a).

### c. Interception of Electronic Communications

Pursuant to the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1),
"it is illegal to intentionally intercept electronic communications." *DISH Network, LLC v.
McCoy*, 2015 WL 1976387, at *2 (N.D. Ohio Apr. 30, 2015). "'[I]ntercept' means the aural or
other acquisition of the contents of any wire, electronic, or oral communication through the use
of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

Northeast Cable acquired DIRECTV's programming signal by representing itself as a
legitimate SMATV customer even though it was not "the owner or manager of the business
entity," *see* ECF No. 22-4 at PageID#: 189. Based on that representation, it receives DIRECTV's
signal and transmits it to hundreds of residential units that it underpays for. Whether that
conduct amounts to "interception" in violation of the ECPA (18 U.S.C. § 2511(1)) is not clear,
and it is not fully discussed in either side's briefing.

With respect to the Elms-to-Riverview microwave broadcast and the Lakeview-to-
Gulfview underground-cable transmission, however, Northeast Cable patently intercepts
DIRECTV's signal in violation of the ECPA. DIRECTV transmits its satellite signal to the Elms
and Lakeview properties, Northeast Cable acquires that signal contemporaneously with

DIRECTV's transmission, and it discreetly redirects the signal to other, unauthorized locations (the Riverview and Gulfview properties). Northeast Cable then profits from its interception and retransmission. *See Luis v. Zang*, 833 F.3d 619, 626-34 (6th Cir. 2016) (thoroughly discussing the meaning and application of the term "intercept").

DIRECTV is likely to succeed on the merits of its claim under 18 U.S.C. § 2511(1).

### d. False Designation of Origin

Pursuant to 15 U.S.C. § 1125(a)(1)(A), an entity is liable for false designation of origin if, "in connection with any goods or services . . . [it] uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin . . . of his or her goods, services, or commercial activities." "Reverse passing off," a species of false designation of origin, occurs when the defendant deliberately passes off the plaintiff's product as its own. *Johnson v. Jones*, 149 F.3d 494, 504 (6th Cir. 1998). Such conduct involves "deliberate theft of a marketholder's goodwill." *Id.* (quoting *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 964 (Fed. Cir. 1990)).

In this case, Northeast Cable represents itself directly to SMATV property residents as "your cable television service provider," and it has delivered and posted "TV Channel Selection Guides" that make no mention of DIRECTV. ECF Nos. 22-65, 43-1; DIRECTV Hearing Exs. 86, 87. It advertises its service at those properties, encouraging residents to "ditch the dish and get the same channels for half price." ECF No. 27-4. In an email to a property manager, Al Pezzenti compared Northeast Cable to Time Warner, a programming provider, and made no mention of DIRECTV. DIRECTV Hearing Ex. 133. In the same email, he described Northeast

Cable as a "system operator" and stated, "we have a grand selection of channels now . . . ."

DIRECTV Hearing Ex. 133.

Until recently, SMATV property owners and managers understood Northeast Cable to be their programming provider and were unaware (in some cases) that DIRECTV was at all involved in their programming. One property manager explained to colleagues that "Northeast is willing to provide cable at a bulk rate that we can then resell to residents." DIRECTV Hearing Ex. 100. When they discovered that Northeast Cable actually provided DIRECTV signal to the SMATV properties, some property manager expressed "[c]onfusion . . . [b]ecause I had never realized there was any connection" between Northeast Cable and DIRECTV." ECF No. 48-2 at PageID#: 1863. Another property manager was asked, "[D]o you have any knowledge of DIRECTV being the actual service that comes through and is provided to residents of the Elms?" She answered, "No, I wasn't aware of it until this investigation started, I guess. A few months ago." ECF No. 48-1 at PageID#: 1859. Another was asked, "Your understanding was that Northeast Cable was providing service on its own totally separate from DIRECTV, right?" She answered, "That's correct." ECF No. 48-3 at PageID#: 1866. From the witness stand, Al Pezzenti acknowledged that SMATV property residents are surprised to learn that they receive DIRECTV programming. ECF No. 50 at PageID#: 2041.

In connection with television programming, Northeast Cable represents itself to consumers as "your cable television service provider" and has caused actual confusion as to the origin of the programming. The harm to DIRECTV is apparent: Northeast Cable's deception deprives DIRECTV of revenues and business relationships it otherwise would likely enjoy.

DIRECTV is likely to succeed on the merits of its claim under 15 U.S.C. § 1125(a)(1)(A).

### e. False Advertising

Pursuant to 15 U.S.C. § 1125(a)(1)(B), an entity is liable for false or misleading advertising if, "in connection with any goods or services . . . [it] uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of [its] goods, services, or commercial activities."

DIRECTV asserts that Northeast Cable has made deliberate efforts to deceive the SMATV property residents as to the nature of its services. It is inaccurate and deceptive for Northeast Cable to hold itself out as "your cable television service provider," ECF No. 22-65; DIRECTV Hearing Exs. 86, 87, because, according to Al Pezzenti's own testimony, Northeast Cable is not a cable television service provider. It was inaccurate to represent that subscribers would "[d]itch the dish" when they "subscribe" to Northeast Cable, ECF No. 27-4; *see* ECF Nos. 22-65, 43-1; DIRECTV Hearing Exs. 86, 87, because the programming with Northeast Cable came from DIRECTV's satellite dish service.

Northeast Cable routinely misrepresents the nature of its services. The harm to DIRECTV is apparent: Northeast Cable's deception deprives DIRECTV of revenues and business relationships it otherwise would likely enjoy.

DIRECTV is likely to succeed on the merits of its claim under 15 U.S.C. § 1125(a)(1)(B).

### f. Common Law Fraud

Under Ohio common law,

The elements of an action in actual fraud are: (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter

> disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Gaines v. Preterm-Cleveland, Inc.*, 514 N.E.2d 709, 712 (Ohio 1987).

In this case, Northeast Cable represented itself as the "customer," specifically, as a "property owner or manager" in SMATV Viewing Agreements with DIRECTV. In most instances, it represented itself as "Northeast Management" or "Northeast Sales," and thereby escaped the attention of fraud detectors at DIRECTV. It represented to DIRECTV that most properties had 20 to 25 units even though many of them had dozens or hundreds. Despite its duty to arrange new SMATV Viewing Agreements for the Riverview properties and the Gulfview property, or, at least, to report an increase in the number of units receiving signal, Northeast Cable simply broadcast DIRECTV's signal from elsewhere and failed to inform DIRECTV of its activities.

Northeast Cable suggests that none of the above representations were made with knowledge of falsity, but the Court declines to credit those suggestions. The Court also declines to credit the suggestion that those representations were not intentionally misleading. Northeast Cable's misrepresentations are the basis for its business model. Northeast Cable's representations to DIRECTV were false and material to relevant transactions, DIRECTV's reliance on those representations was justified,[6] and DIRECTV is proximately injured by its deprivation of revenues and business relationships it otherwise would likely enjoy. Additionally, the Court is not persuaded that Northeast Cable's misrepresentations have ceased. According to

---

[6] For each instance in which Al Pezzenti's name appears on DIRECTV documents, it is accompanied by his signature.

(4:18CV2559)

DIRECTV witness Terek Milligan, the investigation into Northeast Cable's underreporting is still ongoing.  ECF No. 50 at PageID#: 2023.

DIRECTV is likely to succeed on its common-law fraud claim.

### g.  Common Law Tortious Interference

Under Ohio law, a successful claim for tortious interference with a contract must show (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages.  *Kenty v. Transamerica Premium Ins. Co.*, 650 N.E.2d 863, 864 (Ohio 1995); Restatement (Second) of Torts § 766 (1979).

The properties had SMATV contracts with DIRECTV, whether they knew it or not.  *See, e.g.*, ECF No. 22-4.  Northeast Cable not only knew of the existence of those contracts; it arranged the contracts, and Al Pezzenti signed his name on those contracts.  *E.g.*, *id.* at PageID#: 192.  Northeast Cable deliberately causes the SMATV properties to breach their contracts with DIRECTV by encouraging and instructing the properties to charge residents individually for their television programming.  *See* DIRECTV Hearing Ex. 137 ("[W]e can . . . save the residents there a TON of money."); ECF No. 27-4 (advertising monthly price per resident).  Northeast Cable has no justification for interloping in the contracts; it is not an authorized dealer or Authorized Biller for DIRECTV, nor is it the owner or manager of any of the SMATV properties.  ECF No. 27-3 at PageID#: 1588; *see* ECF No. 21 at PageID#: 152; ECF No. 27-3 at PageID#: 1588.  And but for Northeast Cable's involvement, DIRECTV would likely have enjoyed greater revenues and better business relationships with the SMATV properties.

DIRECTV is likely to succeed on its common-law tortious interference claim.

### h. Common Law Unjust Enrichment

Under Ohio state law, a claim based on unjust enrichment has three elements: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment . . . ." *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 799 (Ohio 2005) (citing *Hambleton v. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984)). "[T]he purpose of such claims 'is not to compensate the plaintiff for any loss or damage suffered by him but to compensate him for the benefit he has conferred on the defendant.'" *Id.* (quoting *Hughes v. Oberholtzer*, 123 N.E.2d 393, 397 (Ohio 1954)).

DIRECTV alleges that it has conferred a benefit on Northeast Cable by providing satellite television programming, and that it is entitled to payment for providing that service. ECF No. 13 at PageID#: 106. Northeast Cable, however, asserts that it has never missed a payment to DIRECTV. ECF No. 21 at PageID#: 151. DIRECTV does not deny that its invoices have been satisfied but insists that it provided programming to more units and properties than it was paid for. Taking into account Northeast Cable's underreporting of units and unauthorized transmissions to non-SMATV properties, the Court perceives that DIRECTV is likely to succeed on its common-law unjust enrichment claim.

### 2. Likelihood of Irreparable Harm

Absent preliminary relief, DIRECTV is likely to suffer irreparable harm. The SMATV properties are already fleeing from Northeast Cable. Northeast Cable's counsel stated at the hearing that Northeast Cable has already lost two client properties since these proceedings began in October 2018. *Id.* at PageID#: 1972-73; *see* ECF No. 37. Other SMATV property managers

are also apparently displeased with Northeast Cable.  *See, e.g.,* ECF No. 48-4 at PageID#: 1871

(Q: "Given . . . what you have learned, is [Al Pezzenti] the type of individual that Trumbull

Metropolitan Housing Authority desires to do business with?"  A: "Of course not.").  Northeast

Cable's counsel expressly acknowledged at the hearing that the "relationship" between Northeast

Cable and DIRECTV is "going to end . . . once this litigation is over" and Northeast Cable will

cease doing business at that time.  ECF No. 50 at PageID#: 2118.

 In the meantime, absent an injunction, DIRECTV will be tied to a sinking ship.  As long

as this litigation persists without an injunction, SMATV property owners and managers will

remain contractually bound to Northeast Cable, to whom DIRECTV is unwillingly and

detrimentally associated.  As Northeast Cable's reputation suffers, so too will DIRECTV's

reputation, not just with individual viewers and property owners and managers, but also with

authorized dealers and content distributors.  DIRECTV argues that, when "the conduct to be

enjoined is the unauthorized use of a party's television programming, irreparable harm exists."

ECF No. 22-1 at PageID#: 171 (citing *Dish Network LLC v. McCoy*, Case No. 4:15cv205, 2015

WL 1976387, at *4 (N.D. Ohio Apr. 30, 2015)).  *McCoy* is not quite so categorical, but

DIRECTV's concern for its reputation is compelling.

 DIRECTV concedes that loss of revenue as a result of fraud is ordinarily recoverable at

law, but it suggests that Northeast Cable's "willingness to flagrantly operate outside

[DIRECTV's] requirements . . . makes it difficult to quantify how much [DIRECTV] has lost as

a result of [Northeast Cable's] conduct."  ECF No. 22-1 at PageID#: 172.  The Court observes

that, even when the parties conferred to identify all properties to which Northeast Cable provides

DIRECTV programming, Northeast Cable still concealed at least three properties to which it

transmits DIRECTV signal (Riverview Buckeye, Riverview Tod, and Gulfview Towers). ECF No. 27-3 at PageID#: 1599-1600, 1603; *see* ECF Nos. 22-15, 11; DIRECTV Hearing Exs. 329.15, 89.1, 83.1.  The Court does not credit Al Pezzenti's explanation that believed he had no obligation to reveal those properties to DIRECTV.  DIRECTV understandably lacks confidence that all properties and all units have now been accounted for and that all corresponding damages will be recoverable down the road.

Even if DIRECTV could ultimately identify all unreported units and recover corresponding damages at the conclusion of litigation, it would nevertheless suffer legal and perhaps regulatory exposure in the meantime.  At the hearing, Terek Milligan explained that DIRECTV has contractual obligations to accurately compensate content providers according to the total number of viewers.  ECF No. 50 at PageID#: 2060-61.  DIRECTV may also have regulatory obligations to maintain accurate records of its programming transmissions.  As long as DIRECTV continues to pay its content providers according to Northeast Cable's disorganized and deflated reports, it may be exposed to legal and regulatory enforcement.

Additionally, given counsel's suggestion at the hearing that Northeast Cable will cease doing business one way or another, *id.* at PageID#: 2118, the Court observes that Northeast Cable may not be in a position at the conclusion of this litigation to compensate DIRECTV for the financial and reputational harm it incurs.  *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657 (7th Cir. 2006) (finding a likelihood of irreparable harm because "[a] judgment-proof defendant is not deterred by the threat of money damages").

Finally, the Court notes that, owing to the way this matter was scheduled, the parties had more than four months to discover evidence and prepare their exhibits, examinations, and

arguments. Counsel for both parties acknowledged at the hearing that there was little more they would expect to present if the Court were to schedule a permanent-injunction hearing. *Id.* at PageID#: 1896-97, 1911-12, 2116. The record, thus, is well developed, the case has been well argued, and the parties have brooked the uncertainty of litigation for considerable time. Any further delay in resolving this patently obvious dispute would unnecessarily exacerbate the harm that DIRECTV has already endured.

### 3. Balance of Equities

"[T]he third factor [of the preliminary-injunction test] refers to the balance of equities between the [parties], not just third parties to the litigation." *Rhinehart v. Scutt*, 509 F. App'x 510, 515 (6th Cir. 2013) (citing *Winter*, 555 U.S. at 24-31; *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 579 (6th Cir. 2002)).

Northeast Cable's equipment is on the verge of obsolescence. At the hearing, counsel for both parties agreed that, at some point in the not-too-distant future, all DIRECTV programming will be broadcast in high definition only. ECF No. 50 at PageID#: 2117-19. The equipment installed by Northeast Cable at the SMATV properties cannot receive high-definition signal, and absent some installation of new equipment, the residents at those properties will lose programming when the change takes place. The parties agree that DIRECTV's planned change in signal has already been postponed, and it may occur "in a matter of months" (according to DIRECTV's counsel) or "it may be moved back [by] a year" (according to Northeast Cable's counsel). *Id.* Whatever the precise timeline, the parties agree that, absent an injunction or DIRECTV's willingness to forbear the high-definition signal change, hundreds of residents at the

SMATV properties will likely lose television programming at some point in the next 12 months, at most.

In his deposition in December 2018, Al Pezzenti relayed his understanding that DIRECTV would pay him $35 per new receiver and $700 per property whenever the switch to high-definition broadcasting takes place. ECF No. 27-3 at PageID#: 1587. Given the developments of this litigation, it seems unlikely that any such payments will take place. *See* ECF No. 50 at PageID#: 2118 ("[This litigation] is going to destroy his business."). An injunction, then, would likely benefit third parties in that it would prevent any unnecessary interruption in programming to SMATV property residents owing to Northeast Cable's likely difficulty or inability to keep pace with DIRECTV's planned technological change.

The parties dispute whether residents' monthly costs will increase or decrease if Northeast Cable is enjoined from transmitting and billing for DIRECTV programming. DIRECTV argues that residents' costs will decrease because they will not be burdened with additional costs of Northeast Cable's middleman markup. ECF No. 27 at PageID#: 1519. Northeast Cable argues that any suggestion of a cost decrease is illusory because DIRECTV's practice is to offer a low introductory rate of programming then sharply increase its cost after some time period, placing the monthly rate well above what residents pay now. ECF No. 23 at PageID#: 1452-53. And the Court observes that, even if Northeast Cable's markup is eliminated from residents' bills, the residents or the properties will nevertheless need to arrange and pay for equipment and maintenance through some other means. The middleman markup, in other words, is not entirely wasted on Northeast Cable.

(4:18CV2559)

The Court acknowledges the possibility that some (but likely not all) residents might ultimately pay more per month when billed directly by DIRECTV than they presently do.[7]  But the Court must also acknowledge that residents' monthly bills are likely deflated by Northeast Cable's underreporting of units.  ECF No. 38 at PageID#: 1682-83; *see* ECF No. 27-3 at PageID#: 1560.  When balancing the equities, the Court must consider relative harms not only to third parties but also to the litigants themselves.  *Rhinehart*, 509 F. App'x at 515.  Even if residents' costs are lower now than they ultimately would be if billed directly by DIRECTV, the balance of equities nevertheless tips in favor of an injunction.  DIRECTV is presently harmed by Northeast Cable's underreporting and consequent underpayment for programming.

### 4. Public Interest

"[C]ourts of equity should pay particular regard for the public consequences" of issuing a preliminary injunction.  *Winter*, 555 U.S. at 24 (quoting *Weingarber v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  There is a clear public interest in forestalling consumer deception or confusion.  *OmniAmerica Gp. v. Street Gold Records, Ltd.*, 916 F. Supp. 672, 680 (N.D. Ohio 1996) ("[P]ublic policy concerns weigh in favor of preliminary injunctive relief in order to halt confusion in the marketplace.").  SMATV property managers have already articulated their confusion, ECF Nos. 48-1, 48-2, 48-3, 48-4, and it is very likely that individual residents are also confused.  Additionally, "[t]he public interest is served by enjoining violations of federal law and

---

[7]  The Court declines Northeast Cable's invitation to take judicial notice of DIRECTV's purported rate structure.  *See* ECF No. 23 at PageID#: 1452-53.  That purported fact is not "generally known" within this jurisdiction, nor can it be determined from sources "whose accuracy cannot reasonably be questioned."  *See* Fed. R. Evid. 201.

(4:18CV2559)

enforcing intellectual property interests . . . ." *Dish Network, LLC v. McCoy*, 2015 WL 1976387, at *4 (N.D. Ohio Apr. 30, 2015).

The public interest weighs in favor of an injunction.

### 5. Summary

All factors weigh in favor of issuing a preliminary injunction against Northeast Cable, Al Pezzenti, and Deborah Pezzenti.

### IV. Conclusion

For the foregoing reasons, Northeast Cable's motion for preliminary injunction (ECF No. 1-3) is denied, and DIRECTV's motion for preliminary injunction (ECF No. 22) is granted. A separate Preliminary Injunction Order shall issue.

To avoid interruption of programming to SMATV property residents, Northeast Cable shall persist in maintaining service to the SMATV properties and paying DIRECTV's programming bills for a period of 90 days or until the properties arrange new television programming service, whichever occurs first. Within 14 days of the date of this Order, Northeast Cable shall inform its contacts at the SMATV properties that it is unable to provide or arrange programming beyond that timeline.[8]

The cutoff date for fact discovery shall be June 11, 2019. The cutoff date for dispositive motions shall be July 11, 2019, although parties are invited to submit dispositive motions sooner

---

[8] If possible, the parties may agree to a different timeframe. Absent agreement, the Court's remains in effect.

(4:18CV2559)

if they wish.  Corresponding briefing shall comply with Local Rule 7.1.


     IT IS SO ORDERED.


   April 22, 2019                      /s/ *Benita Y. Pearson*    
Date                                        Benita Y. Pearson
                                           United States District Judge